[Crim. No. 11482. In Bank. Aug. 9, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. THOMAS
FORD WRIGLEY, Defendant and Appellant.

Condra, Baxley & Crouch and Robert C. Baxley for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Bradley A. Stoutt, Deputy Attorney General, for Plaintiff and Respondent.

McCOMB, J.—Defendant appeals from a judgment convicting him of violating section 288 of the Penal Code (lewd and lascivious acts upon the body of a child under the age of 14 years). Upon a prior trial, the jury had been unable to agree on a verdict.

*Facts:* Viewing the evidence in the light most favorable to the People, the record shows that over a period of two or three months in the course of a number of visits by the prosecutrix, an 11-year-old girl, with defendant, a 46-year-old artist, who lived a few doors away, defendant had extensive discussions with the child on sex in which he gave her a liberal education on the subject, including natural and deviate behavior, told her "dirty" jokes, masturbated in her presence and on two occasions rubbed her clitoris with his fingers.

Jerrine testified that she and another little girl would often visit the Wrigleys' backyard to play with their cats. She first started going there early in 1965. She believed that she first met defendant outside of his house in May and they went inside so that defendant could show her "some of his pictures." He showed her a picture of a "lady with . . . her bare breasts . . . showing." From his portfolio he showed her "other pictures of girls without any clothes on." He read her stories from a hard cover book. One of the stories was about a woman who "rubbed her clitoris." Jerrine asked what "clitoris" meant, and defendant answered that "it was for masturbating." He explained that "when you rub your clitoris fast and it makes you feel good." He told her that when she "was home in bed often in the nights [she] should do it to get used to it." He told her to put her finger in her vagina to "get it wider" and said he would give her a tube with a cap that could be filled with hot water to get "it even more wider." Defendant "masturbated the cat" so it "would want to go out and have intercourse."

Defendant further explained the terms autoerotic gratification, fellatio and cunnilingus to Jerrine. He told her about sexual intercourse and drew a "picture of it to explain it." He told her about "queers" and "whores." He showed her a Playboy magazine with "pictures of ladies with bare breasts" and magazines of "nudist colonies" that revealed "men and women and children without any clothes on at all." He told her that for entertainment nudists some times would "climb up on rocks and go to the bathroom on the bushes below, while the rest of them watch them."

Another story read from the book was of a girl with

"dainty feet" who "would roll on her boy friend's penis . . . with her feet." He also told her "dirty stories" and about strip poker. He said that he had intercourse with models who posed for him and would like Jerrine to observe him have intercourse with one of his models so "she would know what it was like." Defendant told her not to tell anyone, especially her parents and his wife, "or else."

Jerrine testified that she had these conversations with defendant at his home when he was alone during eight visits. She saw him masturbate himself twice and believed the first time was about the seventh visit in May and that the second occasion was in June. Defendant had left town for Baja California for about two weeks. The first time Jerrine saw defendant masturbate was before his trip to Mexico; the second time was after his return. After defendant masturbated himself on the seventh visit he asked Jerrine to take down her pants. She did so and he "masturbated" her "about a minute or two." He rubbed her clitoris with his fingers. After defendant masturbated the second time he touched Jerrine over her pants between the legs "where" her "clitoris is."

Late in July Jerrine told a family friend, a young man about 20 years of age, about her experiences, and he informed her parents. She had not told her parents earlier because she "would get in trouble," and it was not "a very nice thing."

On November 26, 1965, defendant was admitted to the intensive care unit of the San Diego Naval Hospital in serious condition for ingestion of poison. A doctor testified that defendant told him he had taken an overdose of Doriden "as a suicidal attempt." The court limited the admissibility of this testimony to show consciousness of guilt.

Defendant's wife, who was employed during customary office hours and was not home except on weekends, testified that defendant left on May 4, 1965, to visit the McCollims in Baja California and that he returned sometime between the 29th and 31st. Thereafter, in mid-June the McCollims visited the Wrigleys at their home, staying about three weeks. She had never seen any nudist magazines in her house and had never heard defendant tell crude stories.

Mrs. McFarlane, a next-door neighbor, testified that she had never seen any nudist magazines in defendant's house, and that about mid-June the Wrigleys had house guests from Mexico for about three or four weeks.

Richard Martin and Patrick McKenna testified that defend-

ant's general reputation in San Diego County for truth, honesty, veracity and morality was good.

Richard McCollim's testimony from the first trial was read into the record. He stated that defendant arrived at Cabo San Lucas in Baja California "around the 4th or 5th of May" and left by plane "toward the very end of May, 27th or 28th, approximately." On June 15, 1965, McCollim and his family arrived in San Diego to visit defendant. They stayed about three weeks, and defendant spent 90 or 95 percent of his time with them. He saw no nudist magazines in defendant's library and did not see Jerrine at the Wrigleys.

Alfred O'Brien testified that he learned that defendant was in Mexico and had talked to defendant on the phone after his return "around Memorial Day, the 30th of May." Defendant worked afternoons for him designing a post card from June 1 to June 11. Defendant's general reputation in the community for truth, honesty, veracity and morality was good.

Defendant testified that he was in Cabo San Lucas at the southernmost tip of Baja California from May 4 to May 30, 1965. From June 2 to June 15 he was employed by Mr. O'Brien and worked at O'Brien's office starting about 1 or 2 o'clock in the afternoon. At no time between January and July of 1965 did he invite Jerrine Dunn into his residence; he never conversed with her about sex, never masturbated in front of her, and never touched her "personal parts"; he was never alone with her at any time; he did not masturbate his cats, and his cats were castrated; he never possessed a nudist magazine; his library contained some 1,200 books covering "practically the entire range of knowledge"; he had about six books on sex, and the books seized by the police at the time of his arrest in August of 1965 were the *Psyschology of Sex* and *The Encyclopedia of Sexual Behavior,* by Havelock Ellis.

On cross-examination defendant admitted that the cats were not castrated until June 15, 1965. Defendant was first called to the police station on July 28, 1965; he was not arrested until August 3, 1965; he spent the period between July 28 and August 3 at home and during that time did not destroy any nudist magazines and had never destroyed any of his books.

*Questions:* First. *When an indictment charges that the offense occurred "during the month of June 1965," and the defense is an alibi, is it error for the court to instruct that the jury may find defendant guilty if they find beyond a*

*reasonable doubt that he committed the offense at any time within the time covered by the evidence?*

*No.* ▮ The precise time of a crime need not be declared in the accusatory pleading. It is sufficient if it alleges the commission of the offense at any time before the filing of the information, except where the time is a material ingredient of the offense. (Pen. Code, § 955; *People* v. *Cox*, 259 Cal.App.2d 653, 660 [2] [66 Cal.Rptr. 576].) The rule as to variance between the time pleaded and the proof applies to alibi cases; "the difference between alibi cases and other cases is not in the permissible variance, but is in the giving of the instructions." (*People* v. *Brown*, 186 Cal.App.2d Supp. 889, 892, 894 [9 Cal.Rptr. 53].) The trial court therefore did not err in refusing to limit the time of the offense to the time charged in the indictment.

▮ Defendant contends that it was error for the court not to have limited the time which the jury could have found the offense to have occurred to the period which the prosecution selected as the time of the commission thereof, namely May or June of 1965.

The phrase "the period which the prosecution selected as the time of the commission of the offenses" was used in *People* v. *Waits*, 18 Cal.App.2d 20, 21 [62 P.2d 1054], citing *People* v. *Morris*, 3 Cal.App. 1, 10 [84 P. 463]. In *People* v. *Brown, supra,* 186 Cal.App.2d Supp. 889, 892, the court said, "We understand the phrase 'the period which the prosecution selected as the time of commission of the offenses' to mean the time the evidence showed the crime was committed, not the time alleged in the accusatory pleading." Defendant contends that this interpretation is "a strained and illogical construction of the holdings in *Waits* and *Morris* and should not be accepted by this court." There is no merit to this contention. The period that the prosecution selected as the time of the commission of the offense and the time that the prosecution evidence points to as the time of the offense are the same.

In *People* v. *Brown, supra,* 186 Cal.App.2d Supp. 889, an act of indecent exposure was testified to as having been committed "during the latter part of January" at a specific time of day, 1:30 in the afternoon. Defendant's alibi was that the only day he was absent from work, which was some miles away from the scene of the crime, was January 5. An instruction that the date of the offense need not be proved as alleged in the accusatory pleading, and that any date within the period of the statute of limitations (one year) is sufficient, was held

erroneous where there was no claim that the prosecution was barred by the statute and defendant had not raised the statute as a defense. The court said "the instructions should have focused the minds of the jurors on that period [latter part of January, as testified by the complaining witness as the time of the offense] instead of running the risk of diverting their attention to other times within the year." (P. 892.)

In *People* v. *Waits, supra,* 18 Cal.App.2d 20, the prosecution evidence was that an offense had been committed on a specified date between the hours of 10:30 a.m. and 1 p.m. Defendant produced an alibi for that date from 9 a.m. to 5 p.m. It was held prejudicial error to instruct that it was wholly immaterial on what day or night the offense was committed provided that the jury believed it was committed within three years (the statute of limitations) prior to the filing of the information. The court said: "In light of appellant's alibi defense, the time the alleged offenses were committed became material, and it was the duty of the trial court to limit the jury in its consideration of the evidence to the period which the prosecution selected as the time of commission of the offenses." (P. 21.)

In *People* v. *Morris,* 3 Cal.App. 1 [84 P. 463], the prosecutrix testified that an act of rape occurred "about 4 o'clock in the afternoon" on a specific date. The information fixed no hour of the day, and the jury was concerned whether they were confined to the time testified to by the prosecutrix or could apply the evidence to any hour of the day. The court instructed that they could consider the evidence with reference to the entire day. Defendant had offered an alibi from about 2:30 p.m. to 6 p.m. A new trial was ordered because, although the jury might have disbelieved the alibi evidence, the prosecution evidence was narrowed down to only one act at a particular hour, and it was error not to instruct the jury to confine their consideration to the time that the prosecutrix testified that the offense had been committed. The appellate court said: "It does not often happen that an alleged crime is narrowed to a particular hour; often not even to a particular day. But, when it is so narrowed, the time, even the hour, may become important." (P. 10.)

There is no inconsistency in the holdings of the foregoing cases and the present one. While there is an obvious factual difference between the present case and those where the prosecution evidence points to a particular day or hour to the exclusion of any other time, an instruction limiting the jury

to a consideration of the time of the offense in accordance with the testimony is proper. Requiring the jury to limit its consideration of the time of the offense to that shown by the evidence precludes them from speculating that it may have occurred at a time other than that shown by the evidence, and the instruction given in the present case permitted no greater latitude than if it had stated the particular months that the evidence showed as the commission of the offense.

During a conference with the court on the subject of instructions, defense counsel proposed an instruction limiting the time that the jury could consider that the offense was committed to the months of May and June. The prosecutor had argued that since Jerrine was confused in her belief that defendant went to Mexico in June, the first touching could have occurred in either April or May, and the second in June. The judge was unwilling to limit the time to May and June as urged by the defense or to April, May and June as urged by the prosecutor, commenting: ". . . it could have been in April because . . . it is possible and . . . not illogical in any way that the prosecutrix is placing her thought of the time on the time he was gone when he went and when he came back." He therefore limited the time to the "time covered by the evidence."[1]

During their deliberations, word was sent to the court that the jury desired to have re-read the instructions pertaining to total defense and the time element. The jury was reinstructed: "I heretofore instructed you that when one, who is not at the place where the crime charged was committed, is later accused of having been present and having committed or taken part in committing such crime, his physical absence from the scene of the crime, or his lack of participation therein, is a complete defense.

"The defendant in this case has introduced evidence tending to show that he did not participate in and was not present at the time and place of the commission of the alleged offense

---

[1]The instructions read: "When, as in this case, it is alleged that the crime charged was committed in a certain period of time, if the jury finds beyond a reasonable doubt that the crime was in fact committed it is not necessary that the proof show that it was committed at the precise time alleged; it is sufficient if the proof shows that the crime was committed on or about that date.

". . . . . . . . . . . . . . . . .

"If you should find, or if you find beyond a reasonable doubt that the offense charged in the indictment was committed by the defendant, and that the same was committed at any time within the time covered within the evidence, you may find the defendant guilty as charged."

for which he is here on trial. If, after a consideration of all the evidence in this case, you have a reasonable doubt that the defendant was present at the time the crime was committed, and that he participated in the alleged crime, he is entitled to an acquittal.

"And you will recall after reading the indictment to you, which was filed in court, I instructed you that when, as in this case, it is alleged that the crime charged was committed in a certain period of time, if the jury finds beyond a reasonable doubt that the crime was in fact committed, it is not necessary that the proof show that it was committed on that precise time; it is sufficient if the proof shows that the crime was committed on or about that time.

"And the second instruction on that same subject is as follows: . . . If you find beyond a reasonable doubt that the offense charged in the indictment was committed by the defendant, and that the same was committed at any time within the time covered in the evidence, you may find the defendant guilty. *Now, that means in the time covered by the evidence. You consider all of the evidence, all of the testimony as to times, not only the little girl's, but the defendant's, the defendant's wife and everybody else.*" (Italics added.)

These instructions, taken as a whole, were neither misleading to the jury nor inconsistent with defendant's alibi evidence. An instruction on time limitation in cases where there is alibi evidence depends on the circumstances of the case. (See CALJIC No. 34.1 (rev. ed. 1958) 1967 Supp. pp. 48-49.) Jerrine testified that defendant first touched her private parts before he left on his trip to Baja California and that the second touching occurred after his return. The jury could have believed that she was molested before and after defendant's vacation, believed that she was mistaken as to the date of his vacation (which she thought was in June), accepted defendant's testimony that his vacation was from May 4 to May 30, and concluded that the first touching occurred in May before he left and the second in June after his return. On the other hand, since she pivoted the incidents around his departure and return and the evidence disclosed that she was mistaken as to the time of defendant's vacation, the jury could have found that the first touching occurred in April and the second in June after his return. The fact that she was vague about calendar dates did not render her testimony false, and the jury's verdict cannot be criticized because of inconsistencies in her testimony. (*People* v. *Cook*, 136 Cal. App.2d 442, 445 [288 P.2d 602].)

While a defendant need only offer evidence that raises a reasonable doubt of his guilt in the minds of the jurors, the alibi evidence in this case was far from conclusive. Defendant testified that he left for Baja California on May 4, a Tuesday. He offered no alibi for Monday, May 3. There was a conflict in the testimony of defendant and his witnesses as to his return. He testified that he was in Baja California from May 4 to May 30. His host, Mr. McCollim, testified that he did not leave there on a weekend because he said defendant left, by plane, on a day when he, McCollim, was working and he "couldn't see him off." The weekend (Saturday and Sunday) dates were May 29 and 30. Mrs. Wrigley was not sure when her husband returned. She thought it was "almost at the end of May, sometime . . . between the 29th and 31st" and "more likely the 29th or 30th." Thus her testimony conflicted with that of Mr. McCollim, who had testified that defendant did not leave on a weekend. Defendant offered no alibi for Monday, May 3 or 31.

As for the month of June, defendant testified that he started to work weekdays for Mr. O'Brien on June 2, continuing until June 15 (Monday) from about 1 or 2 p.m. until late afternoon. Mr. O'Brien testified that defendant first came in on the afternoon of June 1, and the last day he recalled that defendant was at work was Friday, June 11. Therefore, a conflict existed regarding defendant's whereabouts on Tuesday, June 1, and Monday, June 14, the day before the McCollims arrived at the Wrigley residence for a visit of approximately three weeks. ■ The question whether defendant established his alibi is one of fact, and where the evidence is conflicting the determination of the trier of fact will not be disturbed on appeal. (*People* v. *Bradley,* 71 Cal.App.2d 114, 119 [5] [162 P.2d 38].)

■ Defendant further argues that the "time covered within the evidence" extended from January to July 1965. However, the evidence relating to the offense with which he was charged was at the outside from April through June, and this was all that was argued by the prosecution. There is no merit to his contention that "It is entirely possible that [he] might have been able to account for his time during the other months if he had not been taken by surprise." From the first trial, defendant full well knew the nature of the prosecutrix' testimony; and he knew that her testimony at the instant trial was qualified with such statements as "I believe it was," "as I can remember," and "I am not really sure, but I would say

about May, I guess." In view of defendant's awareness of the time variable in her testimony, if he had alibi evidence for April he should certainly have been prepared to produce it. He did not claim surprise at the trial level or request a continuance and cannot now complain on appeal. (*People* v. *Cox, supra,* 259 Cal.App.2d 653, 661 [4b]; *People* v. *Cook, supra,* 136 Cal.App.2d 442, 447 [5]; see also *People* v. *Brown, supra,* 186 Cal.App.2d Supp. 889, 894.)

■ Second. *Did the court err in refusing to instruct that the failure of the prosecutrix to make a prompt complaint of the offense was a circumstance that the jury could consider in determining her credibility?*

*No.* The fact that the victim, who was below the age of consent, made no complaint is immaterial, and an instruction that the jury could consider such fact was properly refused. Her consent, of course, was not an issue in the case. (*People* v. *Edwards,* 163 Cal. 752, 757 [127 P. 58]; *People* v. *Ray,* 187 Cal.App.2d 182, 186 [4] [9 Cal.Rptr. 678]; *People* v. *Jacobs,* 16 Cal.App. 478, 480 [117 P. 615].) Jerrine herself did not complain of defendant's conduct, and related her experiences to an insistent male friend only after he promised to keep her communication a secret. He informed her parents, and they complained to the police. Jerrine testified that she knew what had happened was wrong and did not want to get into trouble with her parents. The trial court gave proper cautionary instructions on credibility, and defense counsel was permitted to argue to the jury that the "delay" in reporting the offense bore on Jerrine's veracity.

Third. *Was it prejudicial error to allow the prosecutor on cross-examination to require defendant to read aloud passages from books that had been taken from his library?*

■ *No.* During direct examination, defense counsel made reference to two sets of books that were visible to the jury and in the possession of the prosecutor. Defendant said that they were his books, that he had used them when he was a student, and that they were seized by the police from his library at the time of his arrest. On cross-examination the prosecutor had these books, a two-volume set entitled *The Psychology of Sex* and a two-volume set entitled *The Encyclopedia of Sexual Behavior,* marked for identification and began to question defendant on their contents over defense counsel's objection that the questions exceeded the scope of direct examination.

The trial court ruled that the cross-examination was proper. Defendant testified that he never conversed with Jerrine

about sex, that he was never alone with her at any time, and denied committing the charged offense. His contradiction of her testimony constituted a direct attack upon her credibility, and his ownership of the books and his familiarity with their contents supported an inference that he was conversant with urolagnia, consolateurs, autoerotism and other sexual aberrations which the prosecutrix testified she heard about from defendant.

In *People* v. *Zerillo*, 36 Cal.2d 222, 228-229 [6-7] [223 P.2d 223], this court said: "If a defendant takes the stand and makes a general denial of the crime with which he is charged the permissible scope of cross-examination is very wide. [Citations.] Moreover, as stated in *People* v. *Teshara*, 141 Cal. 633, 638 [75 P. 338], 'A defendant cannot, by testifying to a state of things contrary to and inconsistent with the evidence of the prosecution, thus indirectly denying the testimony against him, but without testifying expressly with relation to the same facts, limit the cross-examination to the precise facts concerning which he testifies. He can be cross-examined with respect to facts or denials which are necessarily implied from the testimony in chief, as well as with respect to facts which he expressly states.'" (See also *People* v. *McDowell*, 234 Cal.App.2d 54, 59 [5], 60 [6] [44 Cal.Rptr. 79] [hearing denied by the Supreme Court] ; *People* v. *Diaz*, 206 Cal.App. 2d 651, 669 [27-28] [24 Cal.Rptr. 367].)

Jerrine had testified that defendant had told her of nudists who climbed rocks and went "to the bathroom on the bushes below" while others watched. The prosecutor asked defendant if his book did not "have a whole chapter on Undinism and tell how some people get fascination from observing other people urinate." The prosecutor directed defendant's attention to a portion of the chapter on Undinism and asked him to read it aloud. The designated portion pertained to the element of urolagnia and "urination in the Art of Love." The prosecutor then directed defendant's attention to another section on "auto-erotism" and the "fact that penises are made of different subjects" such as glass and "hollowed for the use of water or other warm liquids." Defendant denied telling Jerrine to widen her vagina with her finger and that he "would get her some sort of a tube . . . with hot water in it."

Defendant denied telling Jerrine about the "sexual symbolism of a woman with dainty feet to caress or walk over the penis of a male." The prosecutor directed him to read a

passage pertaining to "women skilled in love" who "take the penis between their feet."

The foregoing cross-examination elicited from defendant matter which tended to overcome the effect of his testimony on direct that he had at no time discussed sex with the prosecutrix and tended to corroborate her testimony that she had learned about deviate sexual behavior from defendant.

■ Fourth. *Did the trial court abuse its discretion by permitting cross-examination of defendant's alibi witness concerning his and defendant's affiliation with the communist and socialist parties?*

*No.* Mr. McCollim, who testified at the first trial, was not present at the second trial, and it was stipulated that his prior testimony could be read into the record. He was asked on cross-examination what defendant's occupation was when the witness first met him. He answered: "I don't remember exactly. He was working in politics campaigns.

"Q. And are you also in campaign politics, that is how you happened to meet him?

"A. I became involved when I met him.

"Q. And you and he were both in politics together then, is that correct?

"A. Well, on a parttime basis."

On redirect examination relating to the witness' observation and knowledge of defendant's library, counsel asked if the library contained, among others, books on Democracy, Socialism, Marxism, American history, and Jeffersonian concepts and principles. On recross, the prosecutor asked:

"This political activity that you were in, some of these books you actually used in your political activity, weren't they?

"A. No.

"Q. Wasn't the political activity of the Communist and Socialist line?

"A. It was.

"Mr. Zaitzow [defense counsel]: What was that question?

"The Witness: Do you want me to explain what my theory was?

"Mr. Zaitzow: Just a moment—

"The Court: Read the question.

"(Record read.)

"Mr. Zaitzow: It was—

"The Court: The question hadn't been concluded. It may be concluded before any objection thereto.

"Mr. Zaitzow: I thought the question had been concluded. I

would object on the grounds that it is immaterial, irrelevant and immaterial and flamboyant in this case, and also not covered by redirect, remote.

"The Court: Sustained.

"Mr. Meloche [prosecutor] : I have no further questions.

"Mr. Zaitzow: Nothing further, your Honor."

Having called the reporter from the first trial to read her original notes, defense counsel knew that the question of which he now complains would be read, and he could have called the court's attention to the fact that his objection had been sustained. Had he done so, the court would have asked the reporter to delete the same. The jury was instructed to disregard matters stricken and questions to which objections were sustained. Under the circumstances there was no error.

█ Fifth. *Was the trial court biased against defendant so as to deprive him of a fair and impartial trial?*

*No.* In his brief, defendant lists 17 page numbers of the reporter's transcript that he contends demonstrate a personal bias against him. These reveal four times when the court properly overruled defendant's objections; once the court sustained its own objection; in five instances the court corrected defense counsel on the state of the testimony; on two occasions the court corrected defendant's counsel as to proper methods in eliciting impeaching testimony or in questioning; once the court interrupted defendant during cross-examination; one time the court informed defense counsel that he could add and subtract as well as the witness; once the court informed defense counsel that he need not ask permission in marking documentary evidence for identification; once, in an effort to expedite cross-examination, the court told defense counsel not to take too much time in going over his notes at the conclusion of his direct examination and added that "you will have an opportunity on redirect if there is anything you have overlooked"; and once the court, at the request of defendant's counsel, offered to let him call a bankruptcy court from the court's office.[2]

---

[2]As a example of defendant's wholly irresponsible attack of a partisan attitude of the trial judge the record shows the following colloquy between the court and defense counsel:

"THE COURT: Mr. Zaitzow, if you are at a convenient stopping place—you can go on if you wish, but if you wish to adjourn now and then finish up in the morning——

"MR. ZAITZOW: All right. My wish is to finish up in the morning, your Honor. But could I—I am supposed to be in bankruptcy court tomorrow morning——

164

■ In the exercise of his broad powers to control the proceedings, the trial judge has a right and duty to expedite the trial and, if necessary in the interests of fairness and efficiency, to participate therein. (*People* v. *Martinez,* 38 Cal.2d 556, 564 [8] [241 P.2d 224].) ■ A reading of the record shows that the trial court was impartial as between the prosecution and defense counsel in his admonitions against repetitious examination. During the afternoon of the third day of the trial he said to the district attorney:

"Mr. Meloche, she has already testified to that. You fellows got the same disease, you go over the same thing two or three times. After the witness answers, you then quote the answer and then ask the question, then quote the answer. Please ask the question and get an answer and then go on.

"Mr. Meloche: Yes, sir. I just wanted to make sure at this point we didn't have any problems.

"The Court: Repetition won't make it any better. I think the jurors listen the first time."

Defendant did not assign any remark of the court as misconduct at the trial and may not now urge the point on appeal. (*People* v. *Amaya,* 40 Cal.2d 70, 78 [11] [251 P.2d 324]; *People* v. *Ralls,* 21 Cal.App.2d 674, 679-680 [4] [70 P.2d 265].) The remarks of which he now complains in no way demonstrate bias or unfairness, and in any event the

"The Court: I am sorry about the bankruptcy court."
·The page of the transcript cited by defendant as indicating an unfair and biased attitude of the court is a continuation of the foregoing discussion. The entire page reads:
"Mr. .Zaitzow: I realize I have been put in this position. I didn't realize the trial would take so long. Could I. call the bankruptcy court from your office and in case they desire to speak to you about this matter——
"The Court: Sure.
"Mr. Zaitzow: Thank you.
"The Court: You will then finish in the morning, your argument?
"Mr. Zaitzow: Yes, sir.
"The Court: We will adjourn, members of the jury, until tomorrow' morning. Do you wish to come in again at 9:30, or 10:00 o'clock? It looks like we are not going to get the case to you much before noon. We will get the rest of Mr. Zaitzow's argument, then the closing argument and instructions. I thought by coming in at 9:30, we might give it to you before noon. Unless it is going to be inconvenient for you, you may come in at 10:00. I might advise you that when you do come tomorrow, whether it be 9:30 or 10:00, you better bring along your-bedroom slippers, and your sleeping gear, because if you don't reach a verdict you will ·be of course locked up for the night tomorrow night.
"A Juror. I feel his Honor should set the 'time.
. "The Court: Well, I will.put it this way, the .sooner you come in, the sooner the case will be submitted to you, and the more time you will have to deliberate in the daylight hours."

court instructed the jury to disregard them: "If, during this trial, I have said anything or I have done anything which may have suggested to you that I am inclined in favor of the claims or the positions of either side in the case, you will not suffer yourselves to be influenced by any such suggestion. I have not expressed, nor have I intended to express, nor have I intended to intimate any opinion of my own as to which witnesses are or are not worthy of your belief, or what inferences you should draw from the evidence. If any expression of mine has seemed to indicate to you an opinion relating to any of these matters, I instruct you at this time to wholly disregard it. During the course of the trial I may have asked a question of a certain witness, or any of the witnesses. My object was to bring out in greater detail facts that were not then fully covered in the testimony and by the questions that had been asked. You are not to assume that because I have asked any questions of the witnesses, that I hold any opinion as to the matters to which the questions relate."

 Sixth. *Was defendant prejudiced by cross-examination of his character witnesses?*

*No.* Defendant's first character witness was asked on cross-examination:

"Q. You stated that you knew his reputation for morality. You say to the best of your knowledge. Now, do you know his reputation for morality in the community?

"A. I think I do, yes.

"Q. Have you talked to anybody about his traits for morality?

"A. Not specifically, I don't think it has ever come up.

"Q. Had you heard that he would take his models into his home and have intercourse with them during the day when his wife was at work?

"A. I did not.

"Q. And had you heard that the defendant, Mr. Wrigley, continuously boasted about his sexual activities with other women throughout the entire years that you have known him?

"A. I did not.

"Mr. Zaitzow [defense counsel]: I am going to object to that as not being founded upon any facts in this case.

". . . . . . . . . . . .

"The Court: If the question is asked in good faith, it is admissible. I mean the 'have you heard' is admissible if the District Attorney is asking it in good faith. He apparently must have, or he wouldn't be asking it because the Court

would admonish him if he didn't. So *if you object on the grounds that it isn't in good faith, I will make the District Attorney make a showing.*

"MR. ZAITZOW: I am objecting on the ground it is not on any facts, incompetent, irrelevant, immaterial.

"THE COURT: It bears upon the opinion given by the witness, and the jury may take it into consideration in weighing the value of this opinion that the witness has given. Proceed.

"BY MR. MELOCHE:

"Q. Have you not heard of that then?

"A. I had not.

"Q. Had you heard the defendant had committed adultery with a woman whose first name was Sandy and caused her marriage to break up?

"A. I had not." (Italics added.)

Two other witnesses, O'Brien and McKenna, who testified to defendant's good moral character, were asked the same questions plus an additional question if they had heard that defendant boasted that he had intercourse with at least one woman in each of his art classes. No objections were interposed to these questions when asked of the witnesses O'Brien and McKenna.

The general rule is that when a defendant puts in issue his reputation for a relevant character trait, the prosecution may rebut the impression created by asking in good faith, whether the witness has heard of specific instances of misconduct by the defendant inconsistent with the traits of good character attributed to him (*People* v. *Thomas,* 58 Cal.2d 121, 132 [14] [23 Cal.Rptr. 161, 373 P.2d 97]) and thus test the sufficiency of such knowledge on which the witness bases his conclusions (*People* v. *Malloy,* 199 Cal.App.2d 219, 226 [4] [18 Cal.Rptr. 545]). ▆▆▆ Defendant concedes that this type of cross-examination is proper but asserts that even though he did not make a proper objection or ask that the district attorney prove his good faith that the "judge in fairness has a duty under the circumstances to make a further inquiry on his own."

Recently, in *People* v. *Eli,* 66 Cal.2d 63, 79 [15] [56 Cal. Rptr. 916, 424 P.2d 356], recognizing the harm that can result when groundless questions are propounded which, in the language of *Michelson* v. *United States,* 335 U.S. 469, 481 [93 L.Ed. 168, 176, 69 S.Ct. 213] "waft an unwarranted innuendo into the jury box," we held that there is "a responsibility on trial courts to scrupulously prevent cross-examination based upon mere phantasy. This may best be done by first ascertain-

ing, *outside the presence of the jury,* 'that the target of the question was an actual event, which would probably result in some comment among acquaintances if not injury to defendant's reputation.' [Citation.]'' (See also *People* v. *Gonzales,* 66 Cal.2d 482, 500-501 [11] [58 Cal.Rptr. 361, 426 P.2d 929].)

In *Eli,* it was said that it was an abuse of discretion, though not prejudicial under the facts in that case, to allow cross-examination of a character witness about a defendant's private misconduct which would not be likely, because of the nature of the act, to have caused general community comment, without the court's first having determined, out of the presence of the jury, that the inquiry related to an actual event and was relevant to the issue of reputation. In the present case, however, the questions whether the witnesses had heard about defendant's extramarital activities were neither groundless nor based on phantasy in view of the prosecutrix' testimony of what defendant had told her. Furthermore, the trial court specifically gave defendant the opportunity of challenging the prosecutor's good faith and would have required him, out of the presence of the jury, to show that he had information on which his questions were based and if he could not do so the cross-examination would have been stricken. Under these circumstances there was no abuse of discretion and no prejudicial error.

The judgment is affirmed.

Traynor, C. J., Tobriner, J., Mosk, J., Burke, J., and Sullivan, J., concurred.

PETERS, J.—I dissent.

The majority today has seriously undermined the defense of alibi.

The purpose of the so-called defense of alibi is to set forth facts which if true establish that the accused could not have committed the crime because he was not present at the time of the offense. (*People* v. *Alexander,* 78 Cal.App.2d 954, 957 [178 P.2d 813].) In this sense an alibi is not an affirmative defense; it is a denial which is proved by affirmative evidence that the accused was at some other place when the offense allegedly occurred. (*People* v. *Bradley,* 71 Cal.App.2d 114, 119 [162 P.2d 38]; *People* v. *Spillard,* 15 Cal.App.2d 649, 652 [59 P.2d 887].) To successfully assert an alibi the defendant need only raise a reasonable doubt as to his guilt. (E.g., *People* v. *Roberts,* 122 Cal. 377, 378 [55 P. 137]; *People* v. *Williamson,*

168 Cal.App.2d 735, 741 [336 P.2d 214]; *People* v. *Mercer,* 103 Cal.App.2d 782, 790 [230 P.2d 4]; *People* v. *Lyle,* 91 Cal.App.2d 45, 49 [204 P.2d 356]; *People* v. *Lewis,* 81 Cal. App.2d 119, 124 [183 P.2d 271].)

An alibi can be effective only if the prosecution has specified within particular limits the time and place of the occurrence. Often where the complaining witness identifies the defendant as the person who committed the crime, the only evidence available to the accused in support of his denial is an alibi. The failure of the complaining witness to fix the time and place of the alleged offense deprives the accused of this opportunity. For this reason, the refusal of the trial court to require proof of the date of the offense where the prosecutrix' testimony is uncorroborated and inconsistent may alone be grounds for reversal. (*People* v. *McCullough,* 38 Cal.App.2d 387, 390 [101 P.2d 531]; *Esquibel* v. *State of Wyoming* (Wyo.) 399 P.2d 395; cf. *People* v. *Ridout,* 154 Cal.App.2d 669, 674-675 [316 P.2d 396].)

The majority recognizes that when a defendant asserts an alibi and the prosecution has specified the time of the offense, he is entitled to an instruction limiting the inquiry of the jury to ''the time that the prosecution evidence points to.'' However, the majority holds that it is not necessary to delimit specific times; it is sufficient to instruct the jury in general terms that it may find that the offense occurred ''any time within the time covered within the evidence, . . .'' The majority reasons that ''Requiring the jury to limit its consideration of the time of the offense to that shown by the evidence *precludes them from speculating* that it may have occurred at a time other than that shown by the evidence, and *the instruction given* in the present case *permitted no greater latitude than if it had stated the particular months* that the evidence showed as the commission of the offense.'' (Italics added.)

This is not true; the instruction given did not preclude the jury from speculating nor was it tantamount to restricting the jury to particular months. When a jury is restricted to specific dates, it is not free to consider other times. However, the purported limitation to ''*any time* within the time covered within the *evidence,* . . .'' (italics added) is so inherently vague that the jury is actually given uncontrolled discretion not only to speculate as to any time as the time of the crime but also to define and evaluate what it considers to be the supporting ''evidence'' for that choice. In effect, the instruction enables a jury to circumvent alibi evidence, which it be-

lieves .to be true, on the theory that the prosecution's witnesses must be mistaken as to the time of the offense, and to *speculate* that the offense was committed at sometime prior or subsequent to the period covered by defendant's alibi evidence.

When the prosecution has specified the time of the offense within stated limits, it is improper to allow the jury to speculate as to other times. (E.g., *People* v. *Brown,* 186 Cal.App.2d Supp. 889, 892 [9 Cal.Rptr. 53] ; *People* v. *Waits,* 18 Cal.App. 2d 20, 21 [62 P.2d 1054] ; *People* v. *Morris,* 3 Cal.App. 1, 10 [84 P. 463].) Too often a jury may believe that the defendant committed the crime. but be unable to convict without disregarding his alibi. The instruction approved by the majority allows a jury to do just that. The jury is free to choose the time of the offense from what *it* considers to be the "evidence." Such evidence may be the mere supposition that the complaining witness was mistaken as to the time of the offense and that, therefore, it occurred at some other time. Yet, under the instruction given the jury is not compelled to specify that other time. The jury may literally follow the instruction and find that the offense occurred "any time" within what it deems to be the "evidence." Clearly, if the jury's consideration of the evidence was constrained within specified times, it could not so conjecture, and it would be compelled to find that the offense occurred within that time period.

The impropriety of the instruction is not lessened when, as in the instant case, it is apparent from the complaining witness' own testimony that she *is mistaken* as to the time of the crime.

In the present case, no less than 10 times did Jerrine testify that defendant molested her in late May and in early June. At least 13 times she testified that she never visited with defendant until early May, although she indicated that she met him perhaps as early as January. She related the first incident of molestation to the time she was studying for final examinations—in late May. Several times Jerrine pivoted the incidents about defendant's vacation which she testified was in June, though defendant's evidence overwhelmingly established his vacation was from May 4 to May 30.

Correspondingly, defendant presented alibi evidence only for the months of May and June.

· In view of this evidence, the jury might have convicted defendant under three theories. First, narrowly construing the alibi evidence, the jury could have found that the offense

occurred in May or June at a time not covered by such evidence. Second, the jury could have disbelieved portions of defendant's alibi. Lastly, the jury, under the instruction given, could have believed that Jerrine was mistaken in her choice of dates, and found that the offense occurred before defendant's vacation in May, a period for which he offered no alibi.

It is this third possibility which discloses the defect in the instruction. Even if, as the majority concludes, the jury could properly find that the offense occurred in April, the instruction did not foreclose other improper alternatives. The evidence indicated Jerrine's association with defendant as far back as January. The instruction did not prevent the jury from speculating as to any time prior to April. Nor, as discussed above, did the instruction compel the jury to ascertain any particular month. The jury may have merely concluded that the act occurred "sometime" prior to defendant's vacation.

There is a substantial danger that the jury did actually depart from the evidence in the instant case. Few crimes tend to inflame the passions of a jury as much as where it is claimed that a child has been sexually abused. (See *People* v. *Burton,* 55 Cal.2d 328, 340-341 [11 Cal.Rptr. 65, 359 P.2d 433].) In such a case, the jury may believe the defendant to be guilty, but be unable to convict him because of a strong alibi. An impassioned jury may seize the slightest opportunity to circumvent the alibi evidence.

In a prior trial of defendant the jury was limited to the specific months of May and June, and could not agree on a verdict. In the instant proceeding, it is apparent that the jury was concerned about the time element for it requested reinstruction. The jury was again told that it need not be concerned with any particular time, but could find that the offense occurred "any time within the time covered within the evidence, . . ." It is quite probable that the jury did just that, found that the offense occurred "any time" before defendant's vacation.

Any possibility of error must necessarily be prejudicial. The time element was of paramount importance as indicated by the indecisive jury in the prior trial and obvious concern of the jury in this proceeding. The evidence of defendant's guilt consisted solely of the testimony of the prosecutrix, an 11-year-old girl. Her detailed and unshakable testimony about her conversations and physical encounters with defendant

strengthened her credibility. On the other hand, she demonstrated a knowledge of sex and perversions apart from her contacts with defendant not possessed by most adults. She defined the meaning of obscene terms and related dirty jokes which she heard from a girl friend. She admitted using obscene words while with Mrs. Wrigley, telling her dirty jokes, and typing colorful four-letter words on the Wrigleys' typewriter. The credibility of her testimony was further eroded by her clearly erroneous determination of defendant's vacation and the alleged times of the offense. In summary, to convict defendant, the jury would have to accept the extremely detailed testimony of Jerrine as to the occurrence of the offense, but reject her equally definite testimony as to the time of the offense. This became an easy task under the instruction given which is now approved by the majority of this court.

It was not only error to instruct the jury that it could find that the offense occurred ''any time within the time covered within the evidence, . . .'' but it was also error to refuse to limit the inquiry of the jury to the months of *May and June,* the only months to which Jerrine testified.

The majority asserts that the defendant had the burden of offering alibi evidence for April. However, the majority misconceives the nature of the burden of proof. The prosecution must prove defendant's guilt, and, where he asserts an alibi, the time of the offense. Jerrine testified that she was molested in May and June, before and after defendant's vacation. Defendant's vacation started on May 4. Any time prior to May would be a matter of speculation. Defendant's guilt cannot be based on conjecture. If the prosecution wanted the jury to consider the month of April, then the People, not defendant, had to offer evidence for that month. This was not done. Defendant was entitled to an instruction delimiting the time of the offense to that shown by the evidence, *specifically, May and June.*

As discussed above, because of the inflammatory nature of the offense and the questionable credibility of the prosecutrix, any error must be considered prejudicial. Both the instruction given and the failure to instruct as to the specific months of May and June were erroneous, and may have improperly enabled the jury to disregard defendant's alibi evidence.

I would reverse the judgment.